# UNITED STATES DISTRICT COURT

### Eastern District of Kentucky
### Central Division at Frankfort

| | |
|---|---|
| Charles L. Gallagher *and* ) | |
| Jessica L. Gallagher ) | |
| *Plaintiffs* ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| Equifax Information Services, LLC ) | |
| *Defendant* ) | |
| Serve: ) | |
|     Corporation Service Company ) | |
|     421 West Main Street ) | |
|     Frankfort, KY 40601 ) | |
| ) | |
| Experian Information Solutions, Inc. ) | |
| *Defendant* ) | |
| Serve: ) | |
|     CT Corporation System ) | |
|     306 West Main Street, Suite 512 ) | |
|     Frankfort, KY 40601 ) | |
| ) | |
| Freedom Mortgage Corporation ) | |
| *Defendant* ) | |
| Serve: ) | |
|     CT Corporation System ) | |
|     306 West Main Street, Suite 512 ) | |
|     Frankfort, KY 40601 ) | |
| ) | |
| Trans Union, LLC ) | |
| *Defendant* ) | |
| Serve: ) | |
|     The Prentice Hall Corp. System ) | |
|     421 West Main Street ) | |
|     Frankfort, KY 40601 ) | |

## COMPLAINT and DEMAND FOR JURY TRIAL

### INTRODUCTION

1.    This is a complaint by Plaintiffs for Defendants' separate violations of the Fair

Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"); the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*; the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; and interrelated state law claims.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331; the FCRA, 15 U.S.C. §§ 1681n and 1681o; RESPA, 12 U.S.C. § 2614; and TILA, 15 U.S.C. §1640. Plaintiffs ask the Court to take supplemental jurisdiction over their state law claims under 28 U.S.C. § 1367. Venue is proper, because many of the relevant events affected and/or damaged consumers living within Franklin County, Kentucky, which is located within this District.

## PARTIES

3.      Plaintiff Charles Gallagher is a natural person who resides in Franklin County, Kentucky.  Mr. Gallagher is a "consumer" within the meaning of the FCRA, as defined at 15 U.S.C. § 1681a(c), and a "person" within the meaning of RESPA, as defined at 12 U.S.C. § 2602(5), and within the meaning of TILA as defined at 15 U.S.C. § 1602(e).

4.      Plaintiff Jessica Gallagher is a natural person who resides in Franklin County, Kentucky.  Mrs. Gallagher is a "consumer" within the meaning of the FCRA, as defined at 15 U.S.C. § 1681a(c), and a "person" within the meaning of RESPA, as defined at 12 U.S.C. § 2602(5), and within the meaning of TILA as defined at 15 U.S.C. § 1602(e).

5.      Defendant Equifax Information Services, LLC ("Equifax") is a foreign limited liability company with principal place of business located at 1550 Peachtree Street NW, Atlanta, GA 30309 registered to do business with Kentucky Secretary of State and a "consumer reporting agency" within the meaning of the FCRA.

6.      Defendant Experian Information Solutions, Inc. ("Experian") is a foreign corporation whose principal place of business is located at 475 Anton Boulevard, Costa Mesa, CA 92626 registered to do business with Kentucky Secretary of State. Experian  is  a  "consumer reporting agency" within the meaning of the FCRA.

7.      Defendant Freedom Mortgage Corporation ("Freedom Mortgage") is a foreign corporation with its principal place of business located at 907 Pleasant Valley Avenue, Mt. Laurel, NJ 08054. Freedom Mortgage is a "furnisher of information" within the meaning of the FCRA, a "person" within the meaning of RESPA, as defined at 12 U.S.C. § 2602(5), and an "organization" and a "person" within the meaning of TILA, as defined at 15 U.S.C. § 1602(d) & (e).

8.      Defendant Trans Union, LLC ("Trans Union") is a foreign limited liability

company whose principal place of business is located at 555 West Adams, Chicago, IL 60661. Trans Union is registered to do business with Kentucky Secretary of State. Trans Union is a "consumer reporting agency" within the meaning of the FCRA.

## STATEMENT OF FACTS

9.      Plaintiffs' claims are a result of Defendants apparent gross negligence in failing to properly maintain, apply and follow the dispute process required of consumer reporting agencies ("CRA's") by the FCRA and by grossly negligent errors of basic accounting and payment application by Defendant Freedom Mortgage Corporation.

**I.      The CRAs' Violation of their Statutory Duties**

10.      As explained on Bankrate.com, a person's credit score is important to many major life events: including housing, employment, and credit:

> Today's economy runs on credit. If you want to get a mortgage loan for a house or a student loan to pay for college, or if you just want to put your lunch on a credit card, a company is extending credit to you.
>
> Your creditworthiness is defined by your three-digit credit score and is the key to your financial life. Good credit can be the make-or-break detail that determines whether you'll get a mortgage, car loan or student loan. On the other hand, bad credit will make it more difficult for you to get a credit card with a low interest rate and it will make it more expensive to borrow money for any purpose, says Liz Pulliam Weston, author of "Your Credit Score."
>
> But even if you're not in the market for a loan, good credit can have a major impact, Weston says.
>
> "Your credit information can be a factor in whether or not you can rent a nice apartment, how much you pay for insurance or whether or not you can get a job," she says. Landlords, insurers and employers frequently use credit information as a litmus test to see if the people they are dealing with are reliable and responsible.
>
> Bad credit can suggest you're a risky bet. While bad credit may only show the details of how you deal with debt, some will extrapolate the characteristics from your financial life to other situations and assume that your bad credit implies that you may be just as irresponsible driving a car, taking care of an apartment or showing up for a job, Weston notes.

Good credit can signify that your financial situation—and the rest of your life—is on the right track.[1]

11.     A person's credit score is determined based on the information contained in credit reports compiled and published by the three major Defendant consumer reporting agencies—Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); and Trans Union, LLC ("Trans Union") (collectively, the "Defendant CRA's").

12.     Recognizing the importance of credit reporting to ordinary American life, Congress enacted the FCRA fifty (50) years ago to effectuate the following:

**(a) Accuracy and fairness of credit reporting**

The Congress makes the following findings:

**(1)** The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

**(2)** An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

**(3)** Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

**(4)** There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

**(b) Reasonable procedures**

It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper

---

[1.]   http://www.bankrate.com/finance/credit-cards/why-is-good-credit-so-important.aspx

utilization of such information in accordance with the requirements
of this subchapter.

15 U.S.C. § 1681.

13.     The FCRA creates obligations for CRA's and furnishers of credit information to
the CRA's and provides statutory rights for consumers while at the same time providing a "quid
pro quo grant of protection to CRA's for statutorily required disclosures." *McAnly v. Middleton
& Reutlinger*, P.S.C., 77 F. Supp. 2d 810, 814 (W.D. Ky. 1999). Because "various parts of the
federal statute require consumer reporting agencies and information users to disclose information
to consumers under certain circumstances, the FCRA [15 U.S.C. § 1681h(e)] guarantees that the
agencies or users cannot be sued for those required disclosures under state tort law." *Id.* So, while
the FCRA creates liabilities for violations of the FCRA, it also immunizes CRA's and furnishers
of credit information from state common-law and statutory claims. Likewise, the FCRA creates a
complicated procedure for consumers to correct errors on their credit report and statutory remedies
when those procedures fail. In exchange for granting consumers these statutory rights and
remedies, the FCRA takes away the consumer's right to bring common-law claims of defamation
and slander of credit.

14.     To correct most errors on their credit reports published by the CRA's, the FCRA
requires that a consumer file disputes with the CRA's concerning false and inaccurate information
on their credit reports. Receipt of a consumer's dispute imposes a duty on the CRA's **(i)** to conduct
a reasonable investigation of the consumer's disputes, **(ii)** to forward the consumer's disputes to
the furnishers of the credit information in question, and **(iii)** provide the consumer notice of the
results of the CRAs' investigation of the consumer's disputes. Receipt of a consumer dispute from
the CRA's requires the furnishers of credit information to likewise conduct a reasonable
investigation of the dispute and forward the results of their investigation to the CRA's. The CRA's
are then required to send prompt notice of the investigative results of to the consumer. In sum, the
FCRA essentially gives both CRA's and furnishers of credit information a free bite at the apple to
correct errors on a consumer's credit report, which insulates the CRA's and furnishers from any
statutory liability under the FCRA.

15.     But the system breaks down if the CRA's fail to maintain and follow the FCRA's
requirements and fail to send notice of a consumer's disputes to the furnishers and/or fail to send
the results of the investigation to the consumer. When this happens, the consumer is left out in the
cold without any substantive means of redress or means to correct credit report errors.

16.     A breakdown by the CRA's of the FCRA's requirements occurred in this case
when the Gallaghers sent the Defendant CRA's multiple dispute letters concerning false and
inaccurate credit information furnished by Freedom Mortgage. None of the Defendant CRA's here
responded to the Gallaghers' dispute by sending them notice of the results of their investigation of

their disputes as required by 15 U.S.C. § 1681i(a)(6). One or more of the CRA's forwarded to Freedom Mortgage one or more of the twelve (12) dispute letters that Mr. and Mrs. Gallagher sent to the CRA's disputing the false and inaccurate credit information furnished by Freedom Mortgage. But the CRAs' non-response to the Gallaghers' twelve different dispute letters has left the Gallaghers in the dark and extremely frustrated in their efforts to correct patently false, defamatory, and inaccurate credit information furnished by Freedom Mortgage.

## II.     Facts as to Freedom Mortgage Corporation

17.     On or about April 27, 2012, the Plaintiffs Charles L. Gallagher and Jessica L. Gallagher (jointly, "the Gallaghers") entered into a note and mortgage with Defendant Freedom Mortgage Corporation ("Freedom Mortgage") for the purchase of their family home.

18.     The mortgage was a FHA home loan and, hence, a "federally related mortgage loan" within the meaning of RESPA, defined at 12 U.S.C. § 2602(1).

19.     On January 23, 2020, Freedom Mortgage sent the Gallaghers an Escrow Account Disclosure Statement. A true and accurate copy of the January 23, 2020 Escrow Account Disclosure Statement (the "Disclosure Statement") is filed as Exhibit "A".

20.     The Disclosure Statement noted an estimated escrow shortage of $439.46. The Disclosure Statement provided the Gallaghers with two options to correct the escrow shortage:

**To correct your shortage, we've outlined two different payment options for you to choose from:**

PART **1**        **Your Mortgage Payment**

Payment information beginning with your 03/01/2020 payment

**Option 1**

Step 1 - Pay your shortage in full by using the coupon below.

Step 2 - After your shortage of $439.46 is applied, your new monthly payment amount will be $895.11.

| Payment Information | Current Monthly Payment | New Monthly Payment |
|---|---|---|
| Principal & Interest | $498.43 | $498.43 |
| Escrow Payment | $373.57 | $396.68 |
| Shortage Spread: | $24.08 | $0.00 |
| **Total Payment:** | **$896.08** | **$895.11** |

· · · · · · · · · · · · · · · · · · · · · · **OR** · · · · · · · · · · · · · · · · · · · ·

**Option 2**

If you choose not to pay your shortage in full (Option 1), this amount will automatically be spread over 12 months. Your new monthly payment will be $931.73.

| Payment Information | Current Monthly Payment | New Monthly Payment |
|---|---|---|
| Principal & Interest | $498.43 | $498.43 |
| Escrow Payment | $373.57 | $396.68 |
| Shortage Spread: | $24.08 | $36.62 |
| **Total Payment:** | **$896.08** | **$931.73** |

21.     The Gallaghers opted for the first option and mailed Freedom Mortgage a check for

$500 (a little extra just in case) along with the "Escrow Shortage Coupon" included with the Disclosure Statement.

22.     On March 2, 2020, Freedom Mortgage sent the Gallaghers the monthly account statement for their home loan. A true and accurate copy of the March 2, 2020 account statement is filed as Exhibit "B."

23.     The March 2, 2020 account statement reflected receipt of the Gallaghers' $500 payment and stated that the amount due on April 4, 2020 was $890.07:



24.     The March 2, 2020 account statement confirmed to the Gallaghers receipt by Freedom Mortgage of their $500 check for payment of the escrow shortage. However, when the Gallaghers reviewed their checking their bank account they noticed that Freedom Mortgage had

not cashed the $500 check they sent to Freedom Mortgage in response to the Disclosure Statement.

25.     On February 29, 2020, Mrs. Gallagher sent a message to Freedom Mortgage through her online account on Freedom Mortgage's website noting that Freedom Mortgage had received the check and applied the funds to the Gallaghers' account but the check still had not cleared their bank's checking account.  Freedom Mortgage did not respond to this message.

26.     On March 23, 2020, Mrs. Gallagher sent Freedom Mortgage another message on its website noting that the $500 check for the escrow shortage had not yet cleared her bank. Freedom Mortgage did not respond to this message.

27.     On April 1, 2020, Freedom Mortgage sent the Gallaghers their monthly account statement for their home loan. A true and accurate copy of the April 1st account statement is filed as Exhibit "C."

28.     The April 1, 2020 account statement reflected timely receipt of the Gallaghers' payment in March 2020 and that there was no default or delay in their account:



29.     On April 14, 2020, Jessica Gallagher called Freedom Mortgage to check on the $500 check. After an extended hold time of at least 30 minutes, Mrs. Gallagher discontinued the call and sent Freedom Mortgage another message through her online account noting her frustration

at being kept hold and having no one to speak with.

      30.    On April 26, 2020, Mrs. Gallagher confirmed with her bank that the $500 check had not cleared her account. On the same day, Mrs. Gallagher sent Freedom Mortgage yet another message concerning the $500 check for the escrow shortage. This message also went unanswered.

      31.    On May 1, 2020, Freedom Mortgage sent the Gallaghers their monthly account statement for their home loan. A true and accurate copy of the May 1st account statement is filed as Exhibit "D."

      32.    The May 1, 2020 account statement reflected timely receipt of the Gallaghers' payment in April 2020 and that there was no default or delay in their account:



      33.    On May 9, 2020, Mrs. Gallagher sent an e-mail to Freedom Mortgage noting that the $500 check had not yet cleared her account which e-mail was extensive and detailed, documenting her attempts to get the issue with the undeposited $500 check taken care and expressing her concern with the potential problems that this might cause the Gallaghers in the future.

      34.    Freedom Mortgage responded to Mrs. Gallagher's May 9, 2020 e-mail with the statement: "Good morning thank you for emailing. I am having our cash department look into this. Will get back to you once I hear back."

35.     Freedom Mortgage responded to Mrs. Gallagher via a message on her account on the Freedom Mortgage website. Freedom Mortgage's message read in pertinent part:

> Thank you for contacting Freedom Mortgage's Customer Care Department. We received your inquiry regarding your [the message has a blank after "your"]. Specifically, we understand you have concerns regarding the escrow portion of your account. We hope that you find the following information helpful
>
> We apologize for the delayed response. **After reviewing your account, our research department determines that the escrow shortage payment in the amount of <u>$500.00 was applied to the shortage on February 12, 2020</u>.** Attached is a payment history for you to review. We appreciate the opportunity to assist you with this matter. It is our goal to make a continuous effort to improve your consumer experience with Freedom Mortgage Corporation We appreciate the opportunity to assist you with this matter.

(bolding and underlining added)

36.     On May 14, 2020, Freedom Mortgage sent Mrs. Gallagher an email that stated: "Hi Jessica [Mrs. Gallagher]. See below, we must have gotten the check for chase and was somehow able to deposit it. Does this make sense?" The "below" was a copy of check drawn on a Republic Bank account for an unrelated and unrecognized couple, who resided in Louisville, KY and not in Frankfort where the Gallaghers' home is located. The Republic Bank check was **Check Number 1772** in the amount of $500, made payable to "Chase Bank", and included the full account number for the unrelated couple's Chase Bank credit card account.

37.     Mrs. Gallagher responded to Freedom Mortgage's May 14, 2020 e-mail as follows:

> that [Republic Bank Check **#1772** payable to Chase Bank] is not my name or account number for my mortgage, nor do I use Chase Bank for anything. If this check was somehow credited to my account for my Freedom Mortgage, I have no idea has such was done at all! The person whose check this shows may have sent her checks to the wrong place, but I assure you that it is not mine! My check, **#2028** was sent to the Escrow Dept address listed in the correspondence that we received about our Escrow Shortage. The check issuer is University of Kentucky Federal Credit Union. I was told [by Freedom Mortgage] that my actual check did come to the correct

place, was [credited] to my Freedom Account, and the physical check was destroyed. There should be some kind of electronic that it followed from your Escrow dept to where it was deposited into the account they use at whatever bank or establishment they use for banking.

(bolding added.)

38.     On May 21, 2020, Freedom Mortgage sent Mrs. Gallagher an email that stated:

Good afternoon, please see below from our lock box.

This case has been reviewed by our lockbox partners and **documented as a procedural error**. Check #1772 was erroneously processed in error with the wrong coupon for Freedom. The checks and coupons from 2/12/20 have already been shredded, therefore, we are unable to determine exactly how this error occurred. Since the remitters check for Escrow Shortage never cleared, you should ask the remitter to issue a new check.

(bolding added)

39.     After receiving this email, Ms. Gallagher called Freedom Mortgage to make electronic payment to cover the $500 escrow shortage. The Freedom Mortgage representative or employee she spoke with did not take the payment and told Mrs. Gallagher that no payment was currently due. Instead, the employee or representative expressed confusion over the state of the Gallaghers' account and said she needed to order a credit assessment for their account and would thereafter get back in touch with Ms. Gallagher.

40.     In early June, the Gallaghers became aware of a negative change in accounting by Freedom Mortgage for their mortgage account and on June 2, 2020, Mrs. Gallagher sent the following message to Freedom Mortgage via its website:

WE PAID OUR JUNE MORTGAGE THAT WAS $890.07 YOU DID NOT ALLOW US TIME TO FIX THE ESCROW SHORTAGE! OUR ACCOUNT IS PAID UP UNTIL JULY!

41.     Freedom Mortgage did not respond to the June 2, 2020 message.

42.     On June 6, 2020, Mrs. Gallagher sent Freedom Mortgage another message via its

website: "You never sent me the electronic transfer when you sent it to your bank or wherever to be processed after saying you did receive it." Freedom Mortgage did not respond to this message.

43.     On June 12, 2020, Mrs. Gallagher sent an email to Freedom Mortgage:

> Last week, I called to see what was going on with my account. I had paid June's mortgage payment but received a notice on my account that you had taken the $500 Escrow shortage out of that, instead of putting it to my mortgage account as it was supposed to go to. Then there was a notice that my JUNE mortgage was now due, but was $931.73!
>
> That is not correct!
>
> That was what our mortgage payment was GOING to be if we didn't pay the Escrow shortage in full in February. I did pay it—as that is what all this other mess is about!—and my account was credited. So starting with February, our monthly payments went to $890.07 from the $872.00 we had been paying before that. I have paid the $890.07 every month from February thru June.
>
> By taking out the Escrow shortage, which you were not supposed to do, that should still only make us short $500. $890.07 + $500.00 only comes to a grand total of $1,390.07 for the month of June, which cover the monthly payment as well as the escrow shortage. I have already paid in the $890.07, so I only owe the $500.
>
> By charging me $931.73 on top of what I paid in already, you would be receiving $1,821.80!
>
> I spoke to a supervisor/manager last week named Marie or Maria. I did not get a last name. She told me that an Escrow Assessment needed to be done **and not to pay anything else until she got that taken care of.** She said she would put a "rush" on it and would email or call me this week with the results. I have not heard anything from anyone, either by phone or email.
> This ongoing issue needs to get resolved and I hope to hear back soon about this assessment.

(bolding and underlining added)

44.     On June 18, 2020, Freedom Mortgage sent the Gallaghers a revised monthly account statement for their home loan. A true and accurate copy of the June 18, 2020 account statement is filed as Exhibit "E."

45.     The June 18, 2020 account statement gives proof to the adage that no good deed goes unpunished:



46.     If Mrs. Gallagher had not tried to make sure that her $500 check was deposited and had not pointed out to Freedom Mortgage that it mistakenly applied it to someone else's account, Freedom Mortgage would have accepted the May 2020 payment with no issues or confusion.

47.     Freedom Mortgage put the Gallaghers' May 2020 payment of $890.07—which is the amount that Freedom Mortgage told them that was due in the May 1, 2020 account statement— into a suspense account. The underlying note and mortgage between the parties does not allow for

-13-

the use of suspense accounts. There is no Kentucky statute or common law that permits the use of suspense accounts. Putting the Gallaghers' May payment into a suspense account was a breach of contract.

48.     It is not clear what the "Curtailment" of $771.15 reflected in the June 18, 2020 account statement represents.

49.     In addition to increasing the payment amount from $890.70 to $931.73, Freedom Mortgage added late fees of $72.86 and unilaterally declared that the Gallaghers owed an additional payment of $931.73. Presumably, the late fees were for March 2020 and April 2020, but that is not clear.

50.     The increased payment amount of $931.73 is consistent with the Option 2 given to the Gallaghers in the Disclosure Statement. Note that the difference between $931.73 and $890.07 is $41.66. And $41.66 times 3 (the number of months between March 2020 when the new payment went into effect and May 2020) is $124.98. So, based on Option 2, the Gallaghers would have been only $124.98 past due. But Freedom Mortgage claimed that the Gallaghers were $1,005.59 ($1,936.32-$931.73) past due as of June 18, 2020.

51.     Freedom Mortgage essentially changed the Gallaghers' payment obligations to Option 2 as described in the Disclosure Statement. In so doing, they no longer had any obligation for payment of the $500 under Option 1, but Freedom Mortgage did not make that adjustment in conjunction with the amount that the Gallaghers allegedly owed Freedom Mortgage.

52.     The Gallaghers timely paid the increased amount of $931.73 but did not pay the total amount of $1,936.32 that Freedom Mortgage claimed was due and owing.

53.     On July 7, 2020, Freedom Mortgage sent the Gallaghers the following message on the Freedom Mortgage website:

> Re: Escrow Account (Taxes or Insurance)
> Thank you for contacting Freedom Mortgage's Customer Care Department. We received your inquiry regarding your account via our secured message center June 2, June 6, and June 12, 2020. Specifically, we understand you have concerns regarding escrow. We hope you find the following information helpful.
>
> After reviewing your account our research determines that the escrow shortage payment of $500.00 applied on February 12, 2020 was reversed off on May 29, 2020 due to the payment was not honored by the bank due to name discrepancy.  Please see attached payment history provided for your review and records. We appreciate the opportunity to assist you with this matter. Please contact us should you have any further questions.

Sincerely,

Freedom Mortgage Corporation

54.     The above message is false in that, the Gallaghers bank did not dishonor the Gallaghers' check. Rather, Freedom Mortgage failed to present the Gallaghers check to the Gallaghers' bank for payment as evidenced by its own admission in its May 21, 2020 message to Mrs. Gallagher via its website, which message admitted that Freedom Mortgage committed a "procedural error" that could no longer be documented because all checks and correspondence that it received from February 12, 2020 had been shredded and destroyed.

55.     After "reversing" the Gallaghers' May 29, 2020 $500.00 payment, Freedom Mortgage did not notify the Gallaghers of an escrow shortage. Freedom Mortgage did not ask for or give the Gallaghers leave to resubmit the $500.00 payment. Rather, Freedom Mortgage unilaterally put the Gallaghers' May 2020 payment in a suspense account, giving them no credit for the payment going forward, and declared them in default.

56.     In July 2020, Mr. and Mrs. Gallagher, by counsel, sent Freedom Mortgage a "notice of error" and "request for information" under the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), and Regulation X, 12 C.F.R. §§ 1024.35, 1024.36 (the "RESPA Letter").

57.     The RESPA letter expressly requested that Freedom Mortgage provide the balance of any suspense account for the Gallaghers' Freedom Mortgage account and disputed all charges and late fees that Freedom Mortgage applied to their Freedom Mortgage account.

58.     Freedom Mortgage responded to the RESPA Letter on August 17, 2020. In its response, Freedom Mortgage stated:

As of the date of this letter, the above reference loan is due for the August 1, 2020 payment. A copy of the most recent billing statement has also been enclosed for your records. Please be advised that other fees and charges may be assessed after the date of this letter in connection with the continued delinquency. We will also continue to report your loan status accurately to the credit bureaus.

Please find below Original Principal Balance, Current Principal Balance, a breakdown of the current Principal and Interest, Escrow (if applicable), Escrow Balance and any funds in Unapplied/Suspense, Late Charges and Uncollected fees.

| | |
|---|---|
| Original Principal Balance: | $104,400.00 |
| Current Principal Balance: | $85,144.54 |
| Principal & Interest: | $498.43 |
| | |
| Escrow Payment: | $433.30 |
| Escrow Balance: | $472.78 |
| Unapplied Balance: | $0.00 |
| Late Charge: | $110.12 |
| Uncollected Fees: | $0.00 |
| Uncollected Escrow Shortage | $-41.66 |

*Please be advised the figures provided to you are not payoff or reinstatement figures.

-15-

59. The information stated in the message is false because the Gallaghers made their August 2020 payment of $931.73, which Freedom Mortgage received on July 31, 2020. Further, the above response notes no funds in suspense account, *i.e.* "Unapplied Balance". But this is objectively false since the June 18, 2020 account statement clearly shows that Freedom Mortgage put the Gallaghers' $890.07 into a suspense account.

60. The account statement dated July 10, 2020 to the Gallaghers clearly shows that the $890.07 remained unapplied. A true and accurate copy of the July 10, 2020 account statement is filed as Exhibit "F."

61. The July 10, 2020 account statement reflects receipt of a payment of $931.73 from the Gallaghers. This payment was for the Gallaghers' July 2020 mortgage payment, which Freedom Mortgage negligently noted and applied to the Gallaghers' June 2020 mortgage payment. If Freedom Mortgage had applied the $890.07 (which it noted was being held as "unapplied funds" in the June 18, 2020 statement) to the Gallaghers' account, *i.e.* given them credit for the payment, the past due amount ("Overdue Payment") should have been only $41.66 or, at the very worst, $166.64 ($41.66 x 4—March, April, May, and June).

62. Even worse, the July 10, 2020 account statement fails to note any funds held in a suspense account. Freedom Mortgage simply made the $890.07 funds for the payment by the Gallaghers for their May 2020 mortgage disappear. The amount no longer appeared on the account statements as being held as unapplied funds. Nor did Freedom Mortgage apply the funds to their account or return the unapplied funds to the Gallaghers. In sum, Freedom Mortgage took the $890.07 payment for itself and converted to and for its own use and enjoyment.



FOR RETURN SERVICE ONLY
PLEASE DO NOT SEND PAYMENTS TO THIS ADDRESS
P.O. BOX 619063
DALLAS, TX 75261-9063

REPRESENTATION OF PRINTED DOCUMENT

## Mortgage Statement
Statement Date 07/10/20



4-807-42246-0021309-002-101-010-000-000

CHARLES L. GALLAGHER
JESSICA L. GALLAGHER

| Contact Information | |
|---|---|
| Phone: | 1-855-690-5900 |
| Customer Care: | Monday - Friday 8:00 a.m. - 10:00 p.m. ET<br>Saturday 9:00 a.m. - 6:00 p.m. ET |
| Find us on the web at: | www.freedommortgage.com |

| | |
|---|---|
| Loan Number | |
| Payment Due Date | 08/01/20 |
| **Amount Due\*\*** | **$1,936.32** |

If payment is received after 08/16/20, $37.26 late fee will be charged.

Property Address:   309 STRATHMORE DR
FRANKFORT KY 406010000

| Account Information | |
|---|---|
| Outstanding Principal | $85,358.44 |
| Deferred Balance | $0.00 |
| Interest Rate | 4.000% |
| Prepayment Penalty | No |
| Escrow Balance | $121.33 |
| Unapplied Funds | $0.00 |

| Explanation of Amount Due | |
|---|---|
| Principal | $214.61 |
| Interest | $283.82 |
| Escrow/Impound (for Taxes and/or Insurance) | $433.30 |
| **Regular Monthly Payment** | **$931.73** |
| Total Fees & Charges | $.00 |
| Overdue Payment | $931.73 |
| Unpaid Late Charges | $72.86 |
| Other/Optional Products | $.00 |
| **Total Amount Due\*\*** | **$1,936.32** |

### Transaction Activity   (06/19/20 - 07/10/20)

| Transaction Description | Date | Interest Paid To Date | Transaction Effective Date | Transaction Amount | Interest Paid | Principal Paid | Escrow Paid | Late Charges Paid | Fees Paid | Optional Insurance | Unapplied Funds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mortgage Insurance | 07/08/20 | 05/01/20 | 07/08/20 | $81.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Payment | 07/10/20 | 06/01/20 | 07/10/20 | $931.73 | $285.24 | $213.19 | $433.30 | $0.00 | $0.00 | $0.00 | $0.00 |

63.   As a direct result of Freedom Mortgage's failure to process the Gallaghers' $500.00 escrow shortage payment, Freedom Mortgage began to report to the Defendant CRA's that the Gallaghers were in default and furnished false and inaccurate information about them and their loan (the "Freedom Mortgage Tradeline"). In particular, Freedom Mortgage began reporting in the Freedom Mortgage Tradeline that the Gallaghers were late in making their payments starting in June 2020.

64.   After Freedom Mortgage made its unilateral declaration of default and its failure to give them proper credit for their payments and general shabby treatment by Freedom Mortgage, the Gallaghers contacted their bank about refinancing their home. The loan officer or bank representative they spoke with informed them that would not qualify for the loan because of the negative credit information furnished by Freedom Mortgage. So, the Gallaghers did not apply for a mortgage at that time.

65.   The current mortgage rate when the Gallaghers spoke with their bank about refinancing their Freedom Mortgage loan was 2.75% per annum or 1.25% *less* than their current

rate with Freedom Mortgage. Over a 30-year span, the 1.25% reduction would have saved them $21,149.83 in interest.

66.    On September 30, 2020, Mr. Gallagher and Mrs. Gallagher sent separate dispute letters to all three CRA's disputing the Freedom Mortgage Tradeline. In particular, Mr. and Mrs. Gallagher disputed the 30-day late notation for June 2020 published by all three CRA's in the Freedom Mortgage Tradeline. Mr. Gallagher and Mrs. Gallagher each included a copy of the payment history for the Freedom Mortgage loan that demonstrated that they in fact timely made their June 2020 mortgage payment.

67.    Receipt of the Gallaghers' dispute letters triggered the CRAs' duties to **(i)** conduct a reasonable investigation of the Gallaghers' disputes, 15 U.S.C. 1681i(a)(1); **(ii)** send Freedom Mortgage notice of the Gallaghers' disputes within five business days of receipt of the Gallaghers' dispute letters, 15 U.S.C. § 1681i(a)(2); and **(iii)** send Mr. and Mrs. Gallagher each the results of their reinvestigations of the accuracy of the Freedom Mortgage Tradeline. 15 U.S.C. 1681i(a)(6).[2]

68.    One or more of the CRA's complied with their statutory duty and sent notice of the Gallaghers' dispute letters to Freedom Mortgage.

69.    Receipt of notice of Mr. and/or Mrs. Gallagher's dispute letters triggered Freedom Mortgage's duty to conduct a reasonable investigation of Mr. and/or Mrs. Gallagher's disputes.

70.    None of the Defendant CRA's complied with their statutory duty under 15 U.S.C. 1681i(a)(6) to send the Gallaghers the results of the reinvestigation of their disputes. Consequently, the Gallaghers had to seek out and acquire copies of the credit reports published by the Defendant CRA's through other means.

71.    Upon review of their credit reports from the Defendant CRA's in mid-October, the Gallaghers learned that the incorrect and inaccurate credit information on the Freedom Mortgage Tradeline was still being reported, *i.e.* Freedom Mortgage did not correct its reporting errors as the result of its investigation into the Gallaghers' disputes.

72.    On November 2, 2020, Mr. and Mrs. Gallagher again each sent separate dispute letters to each of the Defendant CRA's in attempt to correct the false and inaccurate credit information each CRA was publishing in the Freedom Mortgage Tradeline.

---

[2] "A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency."

73.     One or more of the Defendant CRA's complied with their statutory duty by sending Freedom Mortgage notice of the Gallaghers' disputes.

74.     None of the Defendant CRA's sent either Mr. or Mrs. Gallagher the investigative results of their disputes.

75.     Again, Freedom Mortgage failed to correct the false and inaccurate credit information it was reporting about the Gallaghers in the Freedom Mortgage Tradeline.

76.     The Defendant CRA's each violated the FCRA by failing to send Mr. and Mrs. Gallagher prompt and timely notice of the results of the Defendant CRA's and Freedom Mortgage's investigation of the Gallaghers' September 30, 2020 and November 2, 2020 dispute letters concerning the Freedom Mortgage Tradeline. The lack of response from any of the Defendant CRA's and the failure of their efforts to correct the errors in the Freedom Mortgage Tradeline has caused enormous frustration, anxiety, and emotional upset for the Gallaghers. The Freedom Mortgage Tradeline is the only negative item on their credit reports. Freedom Mortgage holds the power to take away the Gallaghers' home through foreclosure. The negative credit information in the Freedom Mortgage Tradeline deprives the Gallaghers of the ability to take advantage of the incredibly low interest rates currently available in connection with refinancing their loan.

77.     Freedom Mortgage violated the FCRA by failing to conduct a reasonable investigation of the Gallaghers' multiple disputes. After conducting its investigation, Freedom Mortgage recklessly and without justification verified that the patently untrue credit information that it was furnishing to the Defendant CRA's about the Gallaghers was correct.

78.     Freedom Mortgage violated RESPA by failing to give the Gallaghers any notice of the alleged escrow shortage after it reversed their $500 escrow payment on May 29, 2020; by falsely stating that it was holding no funds in a suspense account for the Gallaghers in its response to the RESPA Letter; and by not correcting its errors in applying late fees and other charges pointed out to Freedom Mortgage in the RESPA Letter.

79.     Freedom Mortgage was grossly negligent in its handling of the receipt of the Gallaghers' $500 escrow payment and its failure to give the Gallaghers any credit for the $890.07 it put into a suspense account. Freedom Mortgage defamed the Gallaghers and slandered their credit by publishing false and inaccurate credit information to the Defendant CRA's. Freedom Mortgage breached the terms of the note and mortgage with the Gallaghers by putting their $890.07 into a suspense account, by failing to correctly process their $500 escrow payment, and by adding unjustified late fees to their account.

80.     Defendants' violations of law and disregard of the Gallaghers' rights and financial wellbeing have significantly adversely affected the Gallaghers in that, the Freedom Mortgage Tradeline is the only adverse credit information on the Gallaghers' credit reports published by the CRA's. Because of the Defendants' violations as stated *supra*, the Gallaghers cannot apply for or receive a new loan to refinance their home to take advantage of historically low interest rates. Further, the Gallaghers are anxious and distraught by Defendant Freedom Motrgages' and the CRA's conduct resulting in damage to their credit rating; damage to their reputation; and loss of time and money in trying to correct Freedom Mortgage's errors.

81.     The Defendant CRA's made the efforts required of the Gallaghers much more difficult by not providing them timely notice of the results of their disputes, thereby leaving them suspended as to their next steps.

## CLAIMS FOR RELIEF

### I.      Claims against Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union, LLC

82.     Defendants Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union") (collectively, the "Defendant CRA's") each violated 15 U.S.C. § 1681i(a)(6) by failing to send Plaintiff Charles L. Gallagher notice of the results of each Defendant CRA's investigation of Mr. Gallagher's dispute letters dated September 30, 2020 or notice of the results of each Defendant CRA's investigation of Mr. Gallagher's dispute letters dated November 2, 2020.

83.     Each of the Defendant CRA's violated 15 U.S.C. § 1681i(a)(6) by failing to send Plaintiff Jessica L. Gallagher notice of the results of each Defendant CRA's investigation of Mrs. Gallagher's dispute letters dated September 30, 2020 or notice of the results of each Defendant CRA's investigation of Mrs. Gallagher's dispute letters dated November 2, 2020.

84.     Each Defendant CRA's failure to send the Gallaghers notice of the results of the reinvestigation of their disputes left the Gallaghers in the dark and confused as to the status of their dispute with the credit information furnished by Freedom Mortgage.

85.     Each of the Defendant CRA's has a pattern and practice of not sending notice of investigative responses to consumers like the Gallaghers.

IN THE ALTERNATIVE:

86.     In addition to failing to send the Gallaghers notice of each Defendant CRA's results of the reinvestigation of their September 30, 2020 and November 2, 2020 disputes, one or more of

the Defendant CRA's failed to send Freedom Mortgage notice of the Gallaghers' separate September 30, 2020 and November 2, 2020 disputes, thereby partially immunizing Freedom Mortgage from liability for its unfair and outrageous treatment of the Gallaghers in connection with their home loan.

87.     Each Defendant CRA's conduct, actions and inactions were willful, rendering each Defendant CRA separately liable under 15 U.S.C. § 1681n for actual, statutory, and punitive damages, along with attorney's fees and costs.

88.     Alternatively, one or more of the Defendant CRA's conduct, actions and inactions was grossly negligent or negligent, rendering each such Defendant CRA liable under 15 U.S.C. § 1681o for actual damages, along with attorney's fees and costs.

## II.     Claims against Freedom Mortgage Corporation

### A.     Violations of the FCRA

89.     The foregoing acts and omissions of Defendant Freedom Mortgage Corporation ("Freedom Mortgage") violate the FCRA.

90.     After being informed by one or more of the CRA's that Plaintiffs Charles L. Gallagher and Jessica L. Gallagher disputed the accuracy of the information Freedom Mortgage was furnishing to the CRA's concerning Mr. and Mrs. Gallagher and the late payment history of the Freedom Mortgage Tradeline, Freedom Mortgage failed to conduct a reasonable investigation of any of Mr. or Mrs. Gallagher's twelve (12) disputes concerning the Freedom Mortgage Tradeline.

91.     Freedom Mortgage willfully failed to review all relevant information purportedly provided by the CRAs to Freedom Mortgage in conducting its investigation, as required by 15 U.S.C. § 1681s-2(b)(B).

92.     Freedom Mortgage willfully failed to direct the CRA's to delete the Freedom Mortgage Tradeline as required by 15 U.S.C. § 1681s-2(b)(C).

93.     Mr. and Mrs. Gallagher each has a private right of action to assert claims against Freedom Mortgage arising under 15 U.S.C. § 1681s-2(b).

94.     Freedom Mortgage is liable to Mr. and Mrs. Gallagher for the actual damages each has sustained by reason of its willful violations of the FCRA in an amount to be determined by the trier of fact or up to $1,000.00 in statutory damages, whichever is greater, punitive damages in an amount to be determined by the trier of fact and their reasonable attorney's fees, pursuant to 15

U.S.C. § 1681n.

95.    Alternatively, Freedom Mortgage is liable to Mr. and Mrs. Gallagher for the actual damages each has sustained as result of its negligent or grossly negligent violations of the FCRA, in an amount to be determined by the trier of fact and her reasonable attorney's fees pursuant to 15 U.S.C. § 1681o.

**B.    Violations of RESPA**

96.    The foregoing acts and omissions of Defendant Freedom Mortgage Corporation ("Freedom Mortgage") constitutes violations of 12 U.S.C. § 2605 of the Real Estate Settlement Procedures Act ("RESPA").

97.    On July 8, 2020, the Gallaghers, by counsel, sent Freedom Mortgage a Notice of Error and Qualified Written Request (the "RESPA Letter") that disputed Freedom Mortgage's use of a suspense account in connection with the Gallaghers' Freedom Mortgage loan.

98.    In response to the Gallaghers' RESPA Letter, Freedom Mortgage falsely stated that it had not transferred any of the Gallaghers' payments to a suspense account.

99.    The Freedom Mortgage loan documents do not permit the use of suspense accounts nor does Kentucky law expressly authorize such a practice.

100.    Freedom Mortgage's June 18, 2020 revised statement clearly noted that it had placed the Gallaghers' May 2020 payment of $890.70 into a suspense account (labeled as "unapplied funds" on the June 18, 2020 revised statement.

101.    In response to the Gallaghers' RESPA Letter, Freedom Mortgage did not correct its erroneous and unauthorized use of a suspense account for the Gallaghers' loan. Nor did Freedom Mortgage apply the unapplied funds to the alleged past due amounts under the Gallaghers' loan. Despite clearly stating in the June 18, 2020 revised account statement to the Gallaghers that it had placed their $890.07 May 2020 payment in a suspense account, Freedom Mortgage in its response to the RESPA Letter falsely stated that no funds were held in a suspense account. Further, Freedom Mortgage did not, and still has not, credited the Gallaghers' account with the $890.07 it placed into a suspense account nor has it returned the suspended funds to the Gallaghers.

102.    As result of Freedom Mortgage's violation of 12 U.S.C. § 2605, the Gallaghers have the right to recover their actual damages plus attorney's fees and costs under 12 U.S.C. § 2605f(1).

C.     **Violation of TILA**

103.     The foregoing acts and omissions by Freedom Mortgage Corporation constitute violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*.

104.     Regulation Z, 12 C.F.R. § 1026.36(c) provides:

Servicing practices. For purposes of this paragraph (c), the terms "servicer" and "servicing" have the same meanings as provided in 12 CFR 1024.2(b).[3]

(1) Payment processing. In connection with a closed-end consumer credit transaction secured by a consumer's principal dwelling:

(i) Periodic payments. No servicer shall fail to credit a periodic payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency, or except as provided in paragraph (c)(1)(iii) of this section. A periodic payment, as used in this paragraph (c), is an amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle. A payment qualifies as a periodic payment even if it does not include amounts required to cover late fees, other fees, or non-escrow payments a servicer has advanced on a consumer's behalf.

(ii) Partial payments. Any servicer that retains a partial payment, meaning any payment less than a periodic payment, in a suspense or unapplied funds account shall:

(A) Disclose to the consumer the total amount of funds held in such suspense or

---

[3] "Statutory terms. All terms defined in RESPA (12 U.S.C. 2602) are used in accordance with their statutory meaning unless otherwise defined in paragraph (b) of this section or elsewhere in this part." 12 C.F.R. § 1024.2.

> unapplied funds account on the periodic
> statement as required by § 1026.41(d)(3), if a
> periodic statement is required;

105.    Freedom Mortgage violated Regulation Z, 12 C.F.R. § 1026.36(c)(1)(i) by failing to give the Gallaghers proper credit for receipt of their payments from May 2020 through the date of the filing of this Complaint by misapplying receipt of the Gallaghers' payments for each of these months to the payment due the month prior based on its grossly negligent handling of the Gallaghers' $500.00 check for the escrow shortage.

106.    Freedom Mortgage violated Regulation Z, 12 C.F.R. § 1026.36(c)(1)(ii) by sending the periodic statements after June 18, 2020 that failed to note the funds it had placed in a suspense account.

107.    As result of Freedom Mortgage's violation of TILA, the Gallaghers are entitled to recover their actual damages or no less than $400.00 and not greater than $4,000 under 15 U.S.C. § 1640(a) and their costs and reasonable attorney's fees.

### D.    Conversion

108.    The above acts and omissions of Defendant Freedom Mortgage Corporation ("Freedom Mortgage") constitute common-law conversion under Kentucky law.

109.    The Gallaghers sent Freedom Mortgage a check of $890.07 to pay for their May 2020 mortgage payment.

110.    Freedom Mortgage accepted the payment and applied it to their May 2020 mortgage payment.

111.    Due to its gross negligence in handling the Gallaghers' $500.00 payment for the escrow shortage, Freedom Mortgage reversed the Gallaghers' May 2020 payment of $890.07 and put the funds into a suspense account.

112.    The Gallaghers had right and title to the funds that Freedom Mortgage put into the suspense account.

113.    Freedom Mortgage did not apply the $890.07 to the Gallaghers' mortgage account, *i.e.* Freedom Mortgage gave them no credit for the payment received.

114.    Freedom Mortgage did not return the $890.07 to the Gallaghers.

115.    Through Mrs. Gallagher's many messages and emails and in the RESPA Letter, the Gallghers demanded a proper accounting of the $890.07 and to be given full credit for the payment. Freedom Mortgage failed to do so.

116.    Freedom Mortgage "disappeared" (*i.e.* took for its own use and enjoyment) the $890.07 from the suspense account with no explanation as to what happened to funds or what Freedom Mortgage did with the funds.

117.    Freedom Mortgage's actions in taking the $890.07 from the suspense account and converting the funds to its own use and enjoyment was intentional, deliberate, and malicious.

118.    Freedom Mortgage's unlawful actions are the sole and only cause of the Gallaghers' loss of the $890.07.

119.    The Gallaghers have been greatly damaged by Freedom Mortgage's unlawful conversion of the $890.07, including but not limited to being charged an excessive amount, loss of credit, loss of reputation, and loss of the opportunity to refinance their home.

### E.    Negligence

120.    The above acts and omissions of Defendant Freedom Mortgage Corporation ("Freedom Mortgage") constitutes negligence and gross negligence under Kentucky law.

121.    As their mortgage servicer, Freedom Mortgage owed the Gallaghers a duty of care to properly handle and process their payments, including but not limited to the $500.00 check that the Gallaghers mailed to Freedom Mortgage to cover the escrow shortage.

122.    The Gallaghers mailed a $500.00 check along with the coupon to cover the escrow shortage outlined in the coupon to Freedom Mortgage. Freedom Mortgage received the check and coupon but destroyed it and kept no record of receiving it.

123.    After discovering the procedural error as it has admitted in applying someone else's payment to the Gallaghers' escrow shortage, Freedom Mortgage was unable to verify the Gallaghers' payment because it had destroyed the Gallaghers' check and coupon without a making a record of it.

124.    Upon discovery of its mistake, instead of notifying the Gallaghers of the escrow shortage created by its own errors and allowing them to pay the shortage, Freedom Mortgage unilaterally, without justification, and in clear breach of its duty of care reversed the Gallaghers' May 2020 mortgage payment. Freedom Mortgage put the Gallaghers' May 2020 mortgage

payment into a suspense account. This led to cascading late fees and alleged missed payments according to Freedom Mortgage.

125.    The gross negligence of Freedom Mortgage is evidenced by it callous, cavalier treatment of the Gallaghers and its management and servicing of their mortgage account.   The conduct, action and inaction of Freedom Mortgage constitute gross negligence as evidenced by Freedom's Mortgage's callous disregard for the rights of the Gallaghers and its duties toward the Gallaghers include, but are not limited to: **(i)** Freedom Mortgage's admission that it committed a procedural error that it could investigate because it had destroyed all records from February 12, 2021, and **(ii)** Mortgage Freedom's blatant attempt to shift blame and fault the Gallaghers by falsely claiming that it reversed their $500.00 escrow payment because the Gallaghers' bank dishonored their check "due to a name discrepancy".

126.    The Gallaghers have been greatly damaged by Freedom Mortgage's gross negligence, including but not limited to being charged an excessive amount, loss of credit, loss of reputation, and loss of the opportunity to refinance their home.

### F.      Defamation/Slander of Credit

127.    In June 2020, Freedom Mortgage began publishing false and inaccurate credit information about the Gallaghers to the CRA's.

128.    The Gallaghers did not dispute the credit information published by Freedom Mortgage until September 30, 2020.

129.    Until and unless Freedom Mortgage received notice of the Gallaghers' dispute letters from one or more CRA's, the Gallaghers did not and could not have had a cause of action against Freedom Mortgage under the FCRA. Consequently, the FCRA does not preempt the Gallaghers' claims for defamation and slander of credit during the time period between its false and defamatory publication of the credit information about the Gallaghers to the CRA's.

130.    During the time period between when Freedom Mortgage began to publish false and inaccurate credit information about the Gallaghers to the CRA's and Freedom Mortgage's receipt of the Gallaghers' September 30, 2020 dispute letters, the Gallaghers contacted their bank about refinancing their home loan but could not because of the false and inaccurate and defamatory credit information published by Freedom Mortgage about the Gallaghers' payment history for their mortgage account.

131.    The Gallaghers have been greatly damaged by Freedom Mortgage's defamation and slander of credit, including but not limited to being charged an excessive amount, loss of credit,

loss of reputation, and loss of the opportunity to refinance their home.

###    G.    Breach of Contract

132.    The Gallaghers and Defendant Freedom Mortgage Corporation ("Freedom Mortgage") entered into a valid contract constituting a note and mortgage.

133.    The Gallaghers paid $500 to cover the escrow shortage in full compliance with Freedom Mortgage's instructions.

134.    Freedom Mortgage accepted and then destroyed their $500.00 check without presenting it for payment to the Gallaghers' bank.

135.    Freedom Mortgage breached the terms of the note and mortgage by reversing a payment that it had accepted pursuant to its own instructions to the Gallaghers.

136.    Under RESPA, 12 CFR § 1024.17(f), which creates duties for Freedom Mortgage under the terms of the Gallaghers' note and mortgage, Freedom Mortgage was required to give the Gallaghers notice of any escrow shortage. Freedom Mortgage failed to give the Gallaghers notice of the escrow shortage caused by Freedom Mortgage by its gross negligence in handling and processing the Gallaghers' $500.00 payment and check for the escrow shortage. This constitutes breach of contract that deprived the Gallaghers from correcting Freedom Mortgage's own error.

137.    The Gallaghers have been significantly damaged by Freedom Mortgage's breach of contract including but not limited to loss of the $890.07 in the disappeared funds from the suspense account, imposition of unjustified late fees, imposition of a record of false and inaccurate late and missed payments, and loss of the ability to refinance their Freedom Mortgage home loan.

### **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs Charles and Jessica Gallagher request that the Court grant them the following relief:

1.    Award Plaintiffs each the maximum amount of statutory damages against each Defendant pursuant to the FCRA and/or TILA;

2.    Award Plaintiffs their actual damages against each Defendant pursuant to the FCRA;

3.    Award Plaintiffs their actual damages against Defendant Freedom Mortgage pursuant to RESPA, TILA, and for their conversion, negligence, defamation/slander of credit, and

breach of contract claims;

4.      Award Plaintiffs punitive damages against each Defendant for each Defendant's willful violations of the FCRA;

5.      Award Plaintiffs their attorney's fees, litigation expenses and costs;

6.      Grant Plaintiffs a trial by jury; and

7.      Award Plaintiffs all other relief which the Plaintiffs may be entitled.

Respectfully submitted,

/s/ James R. McKenzie
James R. McKenzie
*James R. McKenzie Attorney, PLLC*
115 S. Sherrin Avenue, Suite 5
Louisville, KY 40207
Tel:   (502) 371-2179
Fax:   (502) 257-7309
jmckenzie@jmckenzielaw.com

James Hays Lawson
*Lawson at Law, PLLC*
115 S. Sherrin Avenue, Suite 5
Louisville, KY 40207
Tel:   (502) 473-6525
Fax:   (502) 473-6561
james@kyconsumerlaw.com